DECISION.
{¶ 1} In early 1994, plaintiff-appellant David Emerson was diagnosed with a form of bone cancer known as non-secretory multiple myeloma. At the time of his diagnosis, Emerson was the chief executive officer and one of four beneficial owners of The Emerson Press, Inc. ("Emerson Press"), a family business located in Cleveland, Ohio. Emerson Press provided for its employees a self-funded health insurance plan that was administered through a third party.
 {¶ 2} Emerson was treated with radiation therapy, and he was symptom-free until January of 1995, when he experienced a recurrence of his cancer in multiple locations throughout his body. Emerson was treated with a number of courses of chemotherapy. As his health worsened in the summer of 1995, Emerson began to explore the possibility of selling Emerson Press. In September 1995, Emerson underwent a stem cell transplant and high-dose chemotherapy. Through the fall of 1995, Emerson negotiated the sale of Emerson Press, which took place on December 6, 1995.
 {¶ 3} While he was negotiating the sale of Emerson Press, Emerson was also looking into replacing his health insurance, since coverage through Emerson Press would cease with the sale of the company. In November 1995, Emerson applied for the HMO Health Ohio product sold by defendant-appellee Medical Mutual of Ohio ("Medical Mutual"). His application was approved and his insurance coverage became effective on January 1, 1996. Defendant-appellee University MedNet ("MedNet") was a multi-specialty physician group practice. MedNet had contracted with Medical Mutual to provide medical services covered by the HMO Health Ohio policy to Medical Mutual's subscribers in exchange for a fee. In addition, MedNet agreed to perform "utilization review" for Medical Mutual. Medical Mutual delegated certain member complaints and appeal procedures to MedNet. MedNet implemented, pursuant to Medical Mutual's requirements and specifications, a process for resolving initial complaints by HMO Health Ohio policyholders. Policyholders had a right to appeal MedNet's initial determinations. Such appeals, called "Level II" appeals, and all subsequent appeals were handled by Medical Mutual. Medical Mutual's final decision in any appeal was binding on MedNet.
 {¶ 4} Emerson's HMO Health Ohio policy stated, "The health care services described in this Policy are available to you when provided at our facilities or upon the direction or referral of your Plan Physician participating in HMO Ohio." The "How to Use Your Policy" section contained a subsection entitled "Benefits," which provided, "This section explains each type of health care benefit in your coverage. It tells you what services are covered. All Covered Services are subject to the limitations and exclusions appearing in this Policy and Schedule of Benefits. You cannot, except as stated in this Policy, receive benefits without prior authorization by a Plan Physician and approval by an HMO Health Ohio Medical Director. However, prior authorization does not imply an approval for payment of benefits in excess of our level of benefits." The policy defined "Plan Physician" as "any Physician participating in the HMO Health Ohio Network as listed in the front of your Policy who is either an employee of Medical Mutual of Ohio or a member of a contracted provider group. A list of Plan Physicians is available upon request."
 {¶ 5} Under the policy's heading "Health Care Benefits," the following language appeared: "Restrictions on Choice of Providers. HMO Heath Ohio restricts Member access to health care providers. No benefits are payable for Covered Services which are not provided, arranged and authorized by a Plan Physician and approved by the Medical Director. This applies to all Covered Services except Emergency Services." The policy also contained an "Exclusions" provision that stated in part, "We do not provide benefits for services, supplies or charges: (1) Which are not provided or arranged and authorized by a Plan Physician and approved by an HMO Health Ohio Medical Director. (2) Received from other than a Plan Provider, except for Emergency Services, services pre-authorized by a Plan Physician, or as specified. (3) Which are Experimental/Investigative." "Experimental/Investigative" was defined as "any treatment, procedure, facility, equipment, drug, device or supply which we do not recognize as accepted medical practice or which did not have required governmental approval when you received it. Determination will be made by the Plan in its sole discretion and will be conclusive."
 {¶ 6} Emerson experienced another recurrence of his cancer in October of 1996. He was again treated with radiation therapy. In late summer or early fall of 1997, Emerson began to consider a cancer treatment offered by Dr. Stanislaw Burzynski in Houston, Texas. Dr. Burzynski operated a clinic that treated cancer with a substance called "antineoplastons" that Dr. Burzynski had isolated in his research. Dr. Burzynski was not in the HMO Health Ohio network of physicians.
 {¶ 7} At the time that Emerson began communicating with Dr. Burzynski, his MedNet oncologist was Dr. Ann Rassigna. Emerson never asked Dr. Rassigna for a referral to Dr. Burzynski. Emerson never requested a pre-certification or pre-authorization from Medical Mutual or MedNet for treatment with Dr. Burzynski. Subsequently, Emerson spoke to his new MedNet oncologist, Dr. James Sabiers, about Dr. Burzynski's treatment. Dr. Sabiers refused to issue a referral or to participate in any way with the Burzynski treatment because it was "experimental" and "outside the [Federal Drug Administration], [National Cancer Institute] approved protocols."
 {¶ 8} In late October of 1997, Emerson traveled to Houston to begin treatment with Dr. Burzynski. The Burzynski Clinic ("Clinic") required Emerson to complete paperwork that stated that the treatment was experimental and that he was responsible for all associated costs. The statement of informed consent, which Emerson signed on October 28, 1997, stated in part, "You request to receive treatment with investigational drugs and participate in a clinical research study." The informed consent recited that the therapies were "experimental." The billing agreement Emerson signed with the Clinic referred to the treatment as a "clinical study" and stated that "some and perhaps all of the services provided may be non-covered and/or may not be considered reasonable and necessary under Medicare and other medical insurance plans."
 {¶ 9} Emerson telephoned Dr. Sabiers from Houston, requesting that Dr. Sabiers sign certain forms indicating that he would participate in the study. Dr. Sabiers again refused to participate in Emerson's treatment by Dr. Burzynski.
 {¶ 10} Emerson began treatment at the Clinic in the first week of November, 1997. The Clinic began to submit bills for Emerson's treatment to Medical Mutual. Over a month after Emerson began treatment, the Clinic sent a letter to Dr. Alfred Kendrick, MedNet's medical director, seeking "pre-authorization review" for Emerson's treatment. The Clinic acknowledged that it was not a participating provider within the physician network. In a January 19, 1998, letter to Emerson, with copies to Dr. Burzynski and Medical Mutual, Dr. Kendrick stated that Dr. Burzynski's treatment was not a covered benefit and denied insurance coverage. Emerson did not appeal this denial of benefits.
 {¶ 11} The Clinic appealed Dr. Kendrick's denial of coverage and continued to submit claims for Emerson's treatment to Medical Mutual. In a letter dated October 7, 1998, MedNet upheld its denial of coverage for Dr. Burzynski's treatment. The Clinic pursued a "Level II" appeal to Medical Mutual. On January 15, 1999, Medical Mutual upheld MedNet's denial of coverage. The Clinic continued to submit claims for payment to Medical Mutual. In some cases, the Clinic resubmitted claims that had been previously denied. Apparently, Medical Mutual paid some of the claims "in error."
 {¶ 12} Emerson corresponded with a group called the "Patient Advocacy Foundation" ("PAF") about Medical Mutual's denial of coverage for Dr. Burzynski's treatment. In a letter to the PAF dated August 21, 2000, Emerson stated, "I knew that I should have authorization from the HMO before I started any treatment for my cancer, but I also knew how my HMO oncologists felt about Burzynski and alternative therapy in general. I felt that I tried every therapy prescribed by my HMO oncologists and their therapy had failed me. Since those same doctors could not offer any other therapy and since they refused to help me pursue an alternative therapy, I decided to take my health care in my own hands."
 {¶ 13} On January 3, 2001, Emerson contacted the Ohio Department of Insurance ("ODI") to complain about Medical Mutual's denial of coverage for Dr. Burzynski's treatment. Emerson admitted to ODI that he had not received a referral for the treatment. After reviewing the materials submitted by Emerson, the ODI agreed with Medical Mutual's decision to deny coverage for Dr. Burzynski's treatment. ODI closed its file on January 25, 2001.
 {¶ 14} On July 3, 2001, Emerson filed the within compliant alleging breach of contract, bad faith, and infliction of emotional distress for the defendants' denial of insurance coverage for Dr. Burzynski's treatment. All defendants filed motions for summary judgment, which the trial court granted. Emerson has appealed, raising seven assignments of error for our review.
 {¶ 15} Emerson's first, second and third assignments of error essentially allege that the trial court erred in granting summary judgment in favor of the defendants on his breach-of-contract claims.
 {¶ 16} Summary judgment is appropriate when no genuine issue of material fact remains to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to but one conclusion, and that conclusion is adverse to the party opposing the motion. See Civ.R. 56(C); Temple v. WeanUnited, Inc. (1977), 50 Ohio St.2d 317, 364 N.E.2d 267.
 {¶ 17} "An insurance policy is a contract, and its construction is interpreted as a matter of law. [Citation omitted.] In determining the meaning of the insurance contract, we look at the policy language, giving terms their plain and ordinary meaning, to ascertain a reasonable understanding of the contract." Penn Traffic Co. v. AIU Ins. Co., 99 Ohio St.3d 227,2003-Ohio-3373, 790 N.E.2d 1199, at ¶ 9. Only where the contract is ambiguous must an insurance policy be liberally construed in favor of a claimant who seeks the benefits of coverage. SeeAltvater v. Ohio Casualty Ins. Co., 10th Dist. No. 02AP-422, 2003-Ohio-4758. The rule of liberal construction should not be employed to create an ambiguity when the meaning of the policy is clear. See Hybud Equipment Corp. v. Sphere Drake Ins. Co., Ltd.
(1992), 64 Ohio St.3d 657, 597 N.E.2d 1096; United States FireIns. Co. v. Ohio High School Athletic Assn. (1991),71 Ohio App.3d 760, 595 N.E.2d 418; Tomala v. R.E. Harrington, Inc.
(May 2, 1997), 11th Dist. No. 96-P-0206.
 {¶ 18} Emerson's HMO Health Ohio policy clearly did not cover unauthorized, out-of-network medical services. Pursuant to the policy terms, in order for the medical coverage to apply to any out-of-network services, a pre-authorization was required. In addition, the policy did not cover services, supplies or charges not provided or arranged by a "Plan Physician."
 {¶ 19} Emerson acknowledged in his deposition that he understood that in the absence of a referral Medical Mutual would not pay for health-care expenses charged by an out-of-network physician. (T.d. 107, at 141-142.) Emerson knew that Dr. Burzynski was not a network physician. (T.d. 108, at 326-327.) Emerson admitted that he knew that he should have had authorization from his insurance company before beginning treatment with Dr. Burzynski. (T.d. 108, at 322-333.) Dr. Sabiers refused to give Emerson a referral to see Dr. Burzynski. In corresponding with the PAF, Emerson stated that he did not request pre-authorization because he "knew how [his MedNet] oncologists felt about Burzynski and alternative therapy in general." (T.d. 108, at 582.)
 {¶ 20} The record demonstrates that Emerson knew that he should have obtained pre-authorization for any treatment by Dr. Burzynski, but that he failed even to attempt to do so. Under the plain and unambiguous language of the HMO Health Ohio policy, the expenses associated with Dr. Burzynski's treatment were out-of-network and unauthorized, and, therefore, they were not covered. See Kelley v. HMO Health Ohio (Nov. 22, 1995), 8th Dist. No. 68812.
 {¶ 21} Further, Emerson's HMO Health Ohio plan did not provide coverage for experimental/investigative treatment. Under the policy terms, a treatment was experimental/investigative if it was not recognized by the plan as accepted medical practice or if it did not have required governmental approval.
 {¶ 22} The paperwork that the Clinic required Emerson to complete stated that the treatment was experimental. The statement of informed consent stated that the drugs were "investigational," that the treatment was a clinical study, and that the therapies were experimental. Emerson also signed a billing agreement that referred to Dr. Burzynski's treatment as a "clinical study" and warned that some or all of the services might not be covered by insurance. Dr. Sabiers refused to participate in the treatment because it was outside the Food and Drug Administration ("FDA") and the National Cancer Institute ("NCI") approved protocols. Dr. Burzynski called his treatment "investigational." Dr. Burzynski stated in his deposition that treatment with antineoplastons was not a generally accepted medical practice for the treatment of multiple myeloma. In fact, Dr. Burzynski's antineoplastons had not been approved by the FDA for the treatment of any type of cancer. The fact that Emerson had to be treated under a special exemption because he did not meet the criteria for inclusion in the clinical study did not confer governmental approval on Dr. Burzynski's treatment.
 {¶ 23} Dr. Burzynski's treatment was experimental/investigative as defined in the clear and unambiguous terms of the HMO Health Ohio policy, and, therefore, it was not covered. In addition, any medical services incidental to the treatment by Dr. Burzynski, such as those required by the FDA for participation in the "clinical study," were not covered.
 {¶ 24} Emerson argues that the requirement for pre-authorization was a "condition precedent" that Medical Mutual waived when it mistakenly paid some of the claims submitted by the Clinic.
 {¶ 25} Medical Mutual acknowledged that some of the claims submitted by the Clinic were mistakenly paid. The Clinic's insurance coordinator testified that in some cases insurance companies erroneously paid claims and then reversed the payments. Medical Mutual notified both Emerson and the Clinic on more than one occasion that Emerson's insurance policy did not cover Dr. Burzynski's treatment.
 {¶ 26} Generally, the doctrine of waiver cannot be employed to expand the coverage of an insurance policy. See HybudEquipment Co. v. Sphere Drake Ins. Co., Ltd., supra. Waiver is not available to bring within insurance coverage risks expressly excluded by the terms of the policy. See Hartory v. StateAutomobile Mutual Ins. Co. (1988), 50 Ohio App.3d 1,552 N.E.2d 223.
 {¶ 27} Medical Mutual's actions in notifying Emerson and the Burzynski Clinic that the treatment was not covered by the policy were inconsistent with any theory of waiver. We hold that the payments mistakenly made by Medical Mutual did not operate to expand coverage under the policy where none existed.
 {¶ 28} Emerson also argues that the pre-authorization requirement was a "condition precedent" that could be excused by Medical Mutual. The HMO Health Ohio policy clearly required pre-authorization for Dr. Burzynski's treatment. Emerson, by his own admission, understood the terms of his policy, but he did not even attempt to obtain pre-authorization. His only reason for failing to seek pre-authorization was, essentially, that he knew it would be denied. Assuming, arguendo, that the requirement for pre-authorization was a condition precedent, we hold that Emerson failed to set forth any legally sufficient basis for excusing its non-occurrence.
 {¶ 29} Pursuant to the clear and unambiguous terms of Emerson's HMO Health Ohio policy, there was no coverage for Dr. Burzynski's treatment. The first, second and third assignments of error are overruled.
 {¶ 30} Emerson's fourth assignment of error alleges that the trial court erred in granting summary judgment in favor of the defendants, because R.C. 1751.13(A)(2) required coverage for Dr. Burzynski's treatment.
 {¶ 31} R.C. 1751.13(A)(2) states, "When a health insuring corporation is unable to provide a covered health care service from a contracted provider or health care facility, the health insuring corporation must provide that health care service from a noncontracted provider or health care facility consistent with the terms of the enrollee's policy, contract, certificate, or agreement. The health insuring corporation shall either ensure that the health care service is provided at no greater cost to the enrollee than if the enrollee had obtained the health care service from a contracted provider or health care facility, or make other arrangements acceptable to the superintendent of insurance."
 {¶ 32} R.C. 1751.13(A)(2) does not expand the scope of benefits covered under a policy of insurance; it provides patient access to non-network providers consistent with the terms of the patient's health care insurance. The statute requires that services covered by a health insurance policy be provided outside a provider network if the services are unavailable inside the network.
 {¶ 33} R.C. 1751.13(A)(2) is inapplicable because Dr. Burzynski's treatment was not covered under the HMO Health Ohio policy. The fourth assignment of error is overruled.
 {¶ 34} Emerson's fifth assignment of error alleges that the trial court erred in granting summary judgment on his claims for breach of the insurer's duty of good faith and fair dealing.
 {¶ 35} "An insurer breaches its duty of good faith in attending to a claim when its failure to perform under the contract `is not predicated upon circumstances that furnish a reasonable justification therefore.'" Buckeye Union Ins. Co. v.State Farm Mutual Automobile Ins. Co. (Apr. 16, 1997), 1st Dist. No. C-960282, citing Zoppo v. Homestead Ins. Co.,71 Ohio St.3d 552, 1994-Ohio-461, 644 N.E.2d 397, paragraph one of the syllabus. The duty of good faith operates to ensure that an insurer's performance or refusal to perform under the contract does not impair the insured's right to receive benefits that he might reasonably expect to flow from the contract or the contractual relationship. See Buckeye Union Ins. Co. v. StateFarm Mutual Automobile Ins. Co., supra.
 {¶ 36} Emerson's "bad faith" tort claims were based on Medical Mutual's refusal to pay for Dr. Burzynski's treatment. Dr. Burzynski's treatment was not covered under the HMO Health Ohio policy. Because there was no coverage under the policy for Dr. Burzynski's treatment, Emerson could not maintain a claim for bad faith based on the refusal of Medical Mutual to pay for the treatment. The fifth assignment of error is overruled.
 {¶ 37} Emerson's sixth assignment of error alleges that the trial court erred in failing to strike the affidavit of Dr. Deborah P. Tomba, the director of Medical Mutual's care-management department, because it included a hearsay report that was not based on personal knowledge and was without a proper foundation. Emerson objected to the inclusion of a report by an independent physician that Medical Mutual had obtained to review the Clinic's appeal and to provide an opinion on whether Dr. Burzynski's treatment was considered experimental.
 {¶ 38} We hold that any error that may have occurred in the inclusion of the report was harmless because the record contains ample evidence apart from the report that Dr. Burzynski's treatment was experimental. The sixth assignment of error is overruled.
 {¶ 39} Emerson's seventh assignment of error alleges that the trial court erred in granting summary judgment in favor of the defendants "on the remaining counts," when he had not been afforded adequate discovery. Specifically, Emerson was attempting to obtain agreements between Medical Mutual and MedNet that he "believed contained disincentives for treatment."
 {¶ 40} It is clear that all of Emerson's claims were ultimately based upon Medical Mutual's failure to pay for Dr. Burzynski's treatment under the HMO Health Ohio policy. Dr. Burzynski's treatment was not a covered benefit under the policy, and, therefore, Emerson could not maintain any claims based upon Medical Mutual's refusal to pay for the treatment. The seventh assignment of error is overruled.
 {¶ 41} The judgment of the trial court is affirmed.
Judgment affirmed.
Sundermann, P.J., and Hildebrandt, J., concur.